THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DONNA L. VEGA, Defendant-Appellant.

Fourth District   No. 4—85—0653

Opinion filed August 4, 1986.

Daniel D. Yuhas and John J. Hanlon, both of State Appellate Defender's Office, of Springfield, for appellant.

Craig H. DeArmond, State's Attorney, of Danville (Kenneth R. Boyle, Robert J. Biderman, and Timothy J. Londrigan, all of State's Attorneys Appellate Prosecutor, of counsel), for the People.

JUSTICE WEBBER delivered the opinion of the court:

Defendant was charged in the circuit court of Vermilion County by means of traffic citations with the offenses of improper-lane usage and driving under the influence of alcohol in contravention of sections 11—709 and 11—501(a)(2) of the Illinois Vehicle Code (Ill. Rev. Stat. 1983, ch. 95½, pars. 11—709, 11—501(a)(2)). On July 27, 1985, a jury found defendant guilty of the latter offense. The record contains no indication of the disposition of the former. Thereafter, the trial court sentenced her to 12 months' probation and a fine of $100. This appeal ensued.

The principal controversy on appeal concerns the admission into evidence of the results of a field-sobriety test called the "horizontal gaze nystagmus" test.

The State's sole witness was Illinois state trooper Stanley Hardy. He testified that during the early morning hours of December 3, 1984, he observed a car driving slowly and doing "some weaving." He followed the car and during a short interval saw it drift off the right side of the road twice and cross the center line once. He then stopped the vehicle, and as he approached it noticed a strong odor of alcohol emanating from its interior. The driver was defendant, and there were two male passengers. Hardy requested defendant to get out of the auto and perform some sobriety tests. She complied, although stating that she was not intoxicated.

Hardy caused defendant to perform four tests. The first was the horizontal-gaze-nystagmus test, more of which later. Hardy stated that she failed this test.

The second was a "walk the line" test. She attempted this twice. The first attempt was bad, but defendant claimed she was having difficulty with her shoes, so she tried the test a second time after removing the shoes. On the second attempt she made six of nine possible

errors.

The third test was the "one leg stand." In this test one must stand on one leg, holding the other up and in front and counting to 30. Defendant stated, without assigning any reason, that she could not perform this test. Hardy stated that some persons with physical problems cannot pass either the "walk the line" or the "one leg stand" tests, but defendant made no mention to him of any physical infirmities which she may have had.

The fourth test was the "finger to nose." Defendant also failed this test, being able to touch the tip of her nose only twice in six attempts, although she reached the area of her nose five times.

Hardy further testified that defendant's breath had the odor of alcohol, her speech was somewhat slurred and slow, she was upset, profane, and talkative. Her manner toward Hardy was, in his words, "insulting" but there was no evidence of resistance to arrest.

After being transported to the public safety building, defendant underwent a breathalyzer test which showed a blood alcohol content of .09.

Defendant presented the testimony of a podiatrist who had treated her in 1973, 1980, and 1983, for painful callouses on the plantar surface of her foot. He described the condition as "intractable plantar keratosis" and stated that it would hamper her ability to walk in a heel-to-toe fashion and to stand on one leg.

She next presented the bartender from the tavern where she had stayed from 5 to 5:30 p.m. to 10 to 10:30 p.m. on the evening of December 2, prior to her arrest early on December 3. He stated that she had consumed a maximum of four beers, one hot dog, one Pepsi, and one or two glasses of nonalcoholic tomato juice. He left with defendant and another male acquaintance who was intoxicated about 10:30. The three went to another tavern to celebrate a birthday. They stayed there until about 2 a.m. during which time defendant consumed one-half of a beer. The bartender, Williams, offered the opinion that defendant was not intoxicated and that there was nothing unusual about her driving. Williams later supplied bail for defendant. He also stated that he did not want to see her convicted but would never commit perjury for her.

Defendant testified in her own behalf and offered testimony which was generally exculpatory. She claimed to suffer from emphysema, ulcers, and a bad back. She stated that she had ceased treatment with the podiatrist because of the expense, but that her left foot hurt her "all the time." She largely corroborated Williams' testimony about her whereabouts during the night hours of December 2 and the early

morning hours of December 3 and the amount of alcohol which she had ingested. She denied cursing the trooper and claimed that she raised her voice to him only in retaliation of the fact that he "hollered and yelled" at her. She claimed to have informed Hardy of her foot problems and said that she could not pass the "walk the line" test because the ground was cold and the line was uneven, cracked and under repair. She characterized Hardy's behavior as "rude and ill-mannered." She stated that she was not intoxicated and her only problem was an upset stomach.

In rebuttal Hardy testified that he informed defendant that she could use either leg for the "one leg stand" test and that she could take off her shoes. He also stated that her passengers appeared to be intoxicated, one more so than the other, but no tests were performed on these persons.

During deliberations the jury sent two questions to the trial court; one concerned the date and day of the week of the arrest; the other asked for Hardy's police report. In each case the court informed the jury that it should rely on its collective memory and that it had all of the evidence which had been admitted.

When the jury returned with its guilty verdict, the court commented that it had a difficult time with the case since it had been out about three hours in deliberations.

At the sentencing hearing defense counsel noted that defendant did not have much by way of financial resources and did not have any money.

As we have stated above, the principal issue on appeal is the admission of the horizontal-gaze-nystagmus test. Defendant also complains that the imposition of a fine was an abuse of discretion by the trial court.

So far as we have been able to determine, no other case in this State has passed upon the test. Defendant suggests that we follow *People v. Loomis* (Cal. App. Dept. Super. Ct. 1984), 156 Cal. App. 3d Supp. 1, 203 Cal. Rptr. 767, in which the test was rejected as not reflecting general acceptance in the scientific community. The State has submitted by way of supplemental authority an opinion of the Supreme Court of Arizona (*Arizona v. Blake* (1986), 149 Ariz. 269, 718 P.2d 171) in which the test was approved. In addition the State has attached to its brief portions of a final report prepared by the Southern California Research Institute for the United States Department of Transportation. The report is entitled "Development and Field Test of Psychophysical Tests for DWI Arrests" and is concerned in part with the horizontal-gaze-nystagmus test.

Also, defendant has cited in her brief to three treatises which are said to assert that the test is not accepted in the scientific community and, in any event, is extremely dependent on the training and expertise of the officer administering it. D. Nichols, Drinking/Driving Litigation (1985); J. Tarantino, Defendant Drinking Drivers (2d ed. 1986); and R. Erwin, Defense of Drunk Driving Cases (3d ed. 1986).

The difficulty with all this is that none of it was presented to the trial court and appears for the first time in this court. When the first questions were posed to Hardy concerning the test, defense counsel objected to its validity and the objection was overruled. This was error.

██ It is fundamental that when evidence of a nature which places it beyond the general knowledge of the average individual is sought to be introduced, a proper foundation by way of expert testimony is required. This becomes especially true of technological evidence. It is a natural inclination of jurors to regard such evidence as extremely trustworthy. This has led to much litigation over such evidence as that of the polygraph which has been rejected by our supreme court (*People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070) and the Illinois legislature (Ill. Rev. Stat. 1983, ch. 38, par. 155—11).

In *Baynes* the supreme court cited with approval a statement of the District of Columbia Court of Appeals in *Frye v. United States* (1923), 293 F. 1013, 1014, concerning scientific evidence:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

██ In the instant case there was no testimony concerning the validity of the nystagmus test other than that of Hardy, who described it as follows:

> "I assume the test is conducted with the use of a penlight or another object like a pen or pencil that you hold in front of the subject you wish to test, and you move it horizontally back and forth in front of the defendant, and you are actually testing for three things... The first point is given for smooth tracking. If the eye does not follow smoothly, we move the stimulus approximately a two second movement from here to the side, and they

are to follow it with their eyes without moving their head, just their eyes, and we see if we note if the eye follows smoothly or if it jerks from one spot to another; and that would be one point, if it would jerk from one side to, you know, as it followed. The second thing is, we look for, does the involuntary jerking start before approximately forty five degrees which we estimate as being straight off approximately off of the shoulder, straight out from the shoulder with a little bit of the white of the eye showing on the side when they are looking at that angle. And, if that starts before that, we also deduct a point, and then we look again to see if involuntary jerking is present when the eye is all the way over to the side, and then we complete the test with the other eye."

In our opinion this was an inadequate foundation for the admission of the testimony regarding the results of the test. We note in passing that in *Blake* testimony was received and admitted from one of the authors of the monograph attached to the State's brief described above.

■ Based upon the record before us, and not upon the materials submitted to this court which were not before the trial court, we decline to determine the validity and admissibility of the horizontal-gaze-nystagmus test. That decision must await another day and another case. Exhibits or attachments to appellate briefs, not seen by the trial court, are improper.

■ Even though the admission of the evidence of the results of that test was in error, we believe that there was sufficient other evidence to sustain the jury's verdict. The other tests, "walk the line," "one leg stand," and "finger to nose," are not so abstruse as to require a foundation other than the experience of the officer administering them. Hardy testified that he had made 500 to 600 traffic stops prior to December 1984, approximately 20 of them for driving under the influence of alcohol. While defendant offered evidence in exculpation of her failure of these tests, that became a question of credibility which is particularly within the province of the jury, and we find no basis upon which to controvert its finding.

■ The matter of the fine presents a closer question. The record shows that defendant has had a variety of jobs and at the time of sentencing was unemployed. Her sole asset was a 1979 automobile and she owed substantial amounts of money to various creditors. On a previous conviction for the same offense on a plea she was fined $205 and required two years and seven months in which to pay it. Clearly her ability to pay is minimal.

However, this situation is not substantially different from that of many defendants in similar circumstances. We note that defendant posted $100 bail, although there is some indication in the record that this was done by Williams. If so, this would be in the nature of a loan to defendant. A fine may be satisfied out of the refund of bail which is required by section 110—7(f) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 110—7(f)).

It is accepted doctrine that the trial court is in the better position to adjudge penalties and a reviewing court should not disturb its discretion except in extreme circumstances. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

Therefore, the judgment of the circuit court of Vermilion County is affirmed.

Affirmed.

MORTHLAND and SPITZ, JJ., concur.