THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN BULMAN, Defendant-Appellant.

First District (1st Division)   No. 1—88—2657

Opinion filed April 8, 1991.

Ramsell & Associates, of Schaumburg (Donald J. Ramsell, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Judith M. Gilson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Kevin Bulman appeals from an order denying his petition to rescind a statutory summary suspension of his driver's license.

Defendant, Kevin Bulman, was arrested on May 1, 1988, for: (1) driving with a blood-alcohol concentration over .10 (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501(a)(1)); (2) driving under the influence of alcohol (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501(a)(2)); and (3) driving off the roadway (Ill. Rev. Stat. 1987, ch. 95½, par. 11—704). Bulman was issued a notice of summary suspension pursuant to section 11—501.1 of the Illinois Vehicle Code (Ill. Rev. Stat. 1985, ch. 95½, par. 11—501.1). Subsequently, pursuant to section 2—118.1 of the Illinois Vehicle Code (Ill. Rev. Stat. 1987, ch. 95½, par. 2—118.1), Bulman petitioned the circuit court of Cook County for a judicial hearing with respect to the suspension. For the reasons set forth below, we affirm the suspension.

It was uncontested that on May 1, 1988, at approximately 1:30 a.m., Bulman had an auto accident in which he was injured; that he received a ride home from an individual who passed by the accident scene; and that 30 minutes later Sergeant Steiner arrived at Bulman's home.

At the hearing, Sergeant Steiner testified to the following: He was employed by the Village of Mount Prospect police department, and on May 1, 1988, he responded to an accident scene where a car had struck a pole.[1] The car was severely damaged. He observed blood and flesh on the driver's seat and did not find anyone in the car. When he ran a "check" on the license plates, he discovered that Bulman owned the car and learned Bulman's address.

Additionally, Officer Steiner testified to the following: After examining the accident scene, Officer Steiner went to Bulman's home around 2:15 a.m. When he knocked on Bulman's front door, Bulman answered. When Officer Steiner told Bulman that Bulman's car had

---

[1]However, Bulman later testified that his car hit a fire hydrant.

been involved in an accident, Bulman admitted that he was driving the vehicle at the time. Officer Steiner told Bulman that an accident report had to be filled out, that Officer Edwards was the investigating officer and that Officer Edwards would be at the police station. Officer Steiner asked Bulman to accompany him to the police station to complete the accident report because Officer Edwards would be at the police station. Bulman had cuts and lacerations on his chin and face. Bulman was not given sobriety tests in his home. He was not handcuffed, "patted down" or arrested in his home. Officer Steiner observed Bulman walk and talk and he believed that Bulman was under the influence of alcohol.

Further, Officer Steiner testified to the following: After about five minutes at Bulman's home, Bulman accompanied Officer Steiner to the police station in the back seat of his squad car. The door handles in the back seat did not work, but Officer Steiner testified that he would not have prohibited Bulman from leaving the car. When they arrived at the police station, Bulman was neither fingerprinted nor photographed. Bulman sat in an unlocked police interview room, which is generally where accident victims sit. He never indicated to Bulman that Bulman was not free to leave.

Officer Edwards testified to the following: He was also employed by the Mount Prospect police department, and he met Bulman on May 1, 1988, at about 2:30 a.m. in the interview room. He arrested Bulman around 2:35 a.m. Bulman was given sobriety tests around 3 a.m. A breath test determined that Bulman had a blood-alcohol content (BAC) of .23. He observed that Bulman had lacerations on his nose and chin. Officer Edwards signed the "law enforcement sworn report," wherein he stated that probable cause existed "following a traffic accident investigation" because Bulman smelled strongly of alcohol.

Then, Dr. Daniel J. Brown testified as an expert in forensic toxicology and stated the following: He was employed by the Bureau of Forensic Sciences and that a breath testing instrument uses a "simulator solution." Simulator solution is commonly called "certified control reference samples," and the Illinois Department of Public Health prepares water and alcohol solutions that are tested for their accuracy. These solutions are used as calibration solutions for breath testing devices. The "certificate of analysis" for the alcohol reference solution lot No. 88—139 had a recorded value of 0.100 (mean) for Intoximeter Model 3000. The concentration of lot No. 88—139 on the gas chromatograph was 0.1%. He was of the opinion that because the gas chromatographic analysis indicated .1% and the Intoximeter indicated a .1%,

one of the instruments was incorrectly recording or not calibrated properly.

Additionally, Dr. Brown admitted that a person who weighs 135 pounds (Bulman's weight was recorded as 135 pounds on the police report) would have to consume 12 bottles of beer to achieve a BAC of .23. He stated that a person could "theoretically" achieve a BAC of .23 from a BAC of 0, but that it would "require a heroic effort *** it would have to take, literally, a 16-ounce malt cup full of 100 proof booze, [or] something to that equivalent, and pound it down."

Dr. Dietmar Grohlich also testified as an expert in forensic toxicology. He stated the following: He is the supervisor of the Office of Toxicology for the Illinois Department of Health. His office produces and tests simulator solution for the use on breath test instruments in the State of Illinois. He signed the certificate of analysis for lot No. 88—139. The test might be adversely affected if an individual has blood in his mouth and that blood contained alcohol. The following colloquy took place:

"Q. And on the gas chromatograph analysis [of lot No. 82—112], the concentration there listed is .121 milligram percent, correct?

A. It's 121 milligrams.

Q. 121. All right, can you explain to the Court the discrepancy between these two documents?

A. Yes, actually referring to lot No. 82—112, the concentration which is listed there, 121 milligrams percent refers to the actual alcohol concentration as determined by the gas chromatograph.

Q. All right, alcohol concentration in what?

A. 121 milligrams of alcohol, and the percent sign stands for 100 milliliters of acreage [water] solution.

* * *

Q. On the other 88—139, what does the .1 percent stand for?

A. .1 percent as you notice the milligram is missing here, a gram is missing. Shows a concentration equivalent. The gas chromatographic result was deemed to be equivalent to the value recorded for the breathalyzer, 0.10.

Q. Does this reflect a difference in scientific procedure or difference in paper work?

A. No, actually the procedures were exactly the same. It's a difference of paper work.

* * *

Q. But what exactly does the .1 percent stand for?

A. A concentration equivalent.

Q. Equivalent of what?

A. This is the gas chromatographic equivalent for the breathalyzer reading of .1 percent."

Bulman testified to the following: He was drinking prior to his accident. As he approached an intersection, a car was on the wrong side of the road. When he tried to go around the car, he hit a fire hydrant. His head hit the steering wheel and he sustained facial lacerations and a broken nose. A "couple" took him home. When he arrived home, he consumed two cocktail glasses of scotch. He did not recall being placed under arrest when the officer came to his house. When he was transported to the police station, he was of the opinion that he was not free to leave of his own volition. At the police station, he did not smoke, eat or place anything in his mouth before taking the breath test but there was still a certain amount of bleeding throughout his sinuses and in his nose. He had a terrible taste of a blood combination in his mouth which he only *"guessed"* occurred within the 20 minutes preceding the test.

Then, Richard Tracey testified to the following: He was employed by the Mount Prospect police department and was trained as a breath test operator. On May 1, 1988, he began observing Bulman about 2:55 a.m. He sat about three feet away from Bulman. He noticed a little blood around Bulman's mouth but did not look inside Bulman's mouth. When the observation period ended about 3:25 a.m., he gave Bulman the breath test.

The trial court determined that Bulman did not meet his burden by clear and convincing evidence that the breathalyzer results should be excluded despite his assertion that the results were caused by his post-accident drinking. The following were the court's findings: The court was concerned that at the statutory summary suspension hearing the defendant would simultaneously give evidence that could be used against him in his criminal proceeding. The court felt "comfortable" in ruling in favor of the State on the issue of whether the statutory summary suspension proceeding was followed appropriately and whether the breathalyzer results ought to be admitted in the summary suspension hearing because those issues involved assessing the witnesses' credibility. However, the trial court summarily held in favor of Bulman with respect to the motion *in limine* which barred the State from introducing the breathalyzer result in any future related criminal proceeding. As a consequence, the trial court would not assess Bulman's credibility regarding his testimony that he drank scotch after being involved in the car accident. In deciding the motion *in limine*, the trial court did not think it had the right to "fuss around" with the issues of

credibility of the witness in a criminal case when the State has the burden of proving its case beyond a reasonable doubt. The court felt "comfortable" dealing with the issue of Bulman's credibility regarding his testimony about post-accident drinking in the summary suspension hearing.

Specifically, the court found that Sergeant Steiner's testimony was credible; that Officer Tracey's testimony was credible; that the arresting officer's testimony was credible; that Sergeant Steiner was the arresting officer; that Bulman was arrested when Sergeant Steiner said "would you like to come down to the station" because Bulman was not free to leave; that the State proved by clear and convincing evidence that Bulman took a breathalyzer test, that its results were sufficient for the court to believe that his blood-alcohol content was in excess of .10; and that "whatever defects there were [in the breath test], they seemed insufficient to excuse the results on this particular test as to make a finding of .10 or over .10 against the manifest weight of the evidence."

Bulman appeals the trial court's order denying his petition to rescind the statutory summary suspension of his driver's license. For the reasons set forth below, we affirm.

■■■ Summary suspension rescission hearings are civil proceedings in which the petitioner bears the burden of proof by a preponderance of the evidence. (Ill. Rev. Stat. 1987, ch. 95½, par. 2—118.1(b); *People v. Sanders* (1988), 176 Ill. App. 3d 467, 469, 531 N.E.2d 61.) The petitioner must first make a *prima facie* case that the test results are not reliable. (*People v. Gryczkowski* (1989), 183 Ill. App. 3d 1064, 1070, 539 N.E.2d 1360, citing *People v. Orth* (1988), 124 Ill. 2d 326, 340, 530 N.E.2d 210.) Elements of such a *prima facie* case include: whether the breathalyzer test was properly administered; whether the result was accurate; whether the result was trustworthy (*Gryczkowski*, 183 Ill. App. 3d at 1070 (and see cases cited therein)); and whether the Illinois Department of Public Health Rules were violated. (*People v. Hamilton* (1987), 118 Ill. 2d 153, 160, 514 N.E.2d 965.) After the petitioner makes a *prima facie* case for rescission, the burden shifts to the State. The trier of fact's finding with respect to whether the petitioner met his burden of proof will only be reversed if it is against the manifest weight of the evidence. (*Sanders*, 176 Ill. App. 3d at 469.) "A finding is against the manifest weight of the evidence where an opposite conclusion is clearly evident from the record." *People v. Torres* (1987), 160 Ill. App. 3d 643, 646, 513 N.E.2d 1142, *appeal denied* (1988), 118 Ill. 2d 550, 520 N.E.2d 392, citing *People v. Jacquith* (1984), 129 Ill. App. 3d 107, 117, 472 N.E.2d 107.

Initially, Bulman argues that the trial court erred in sustaining his summary suspension when he introduced evidence: (a) that he consumed alcohol after his accident; (b) that there was blood in his mouth immediately preceding the breath test; and (c) that the Illinois Department of Public Health Rules were violated.

■ Bulman argues without merit that the trial court erred in not rescinding his summary suspension because he testified that he consumed two cocktail glasses of scotch *after* the car accident and, thus, the State did not sufficiently establish that his blood-alcohol content was .10 or more *at the time of driving*. Bulman cites *People v. Kappas* (1983), 120 Ill. App. 3d 123, 458 N.E.2d 140, and *People v. Malik* (1983), 113 Ill. App. 3d 206, 446 N.E.2d 931, as authority for his argument. However, *Kappas* and *Malik* plainly do not pertain to summary suspension hearing issues. In *Kappas* and *Malik*, both defendants were appealing their *criminal convictions* of driving under the influence of alcohol, which presents different issues. While it is clear that Bulman may challenge the validity of the breath test (*People v. Hamilton* (1987), 118 Ill. 2d 153, 161, 514 N.E.2d 965; Ill. Rev. Stat. 1987, ch. 95½, par. 2—118.1), the trial court determined that Bulman's testimony regarding his alleged post-accident drinking was not credible and that the breath test results were sufficient to find that his blood-alcohol content was in excess of .10. The trial court's finding is supported by Bulman's admission that he was drinking before his accident, his own expert's testimony that a "heroic effort" (*e.g.*, a 16-ounce malt cup of 100 proof alcohol) was necessary to consume enough alcohol to achieve a BAC of .23 from a BAC of 0, and Bulman's testimony that he only consumed two cocktail glasses of scotch following the accident. Bulman did not introduce any evidence that the two scotches, combined with his admitted pre-accident drinking, could have resulted in a BAC of .23, while still being below .10 at the time of the accident. Therefore, we do not have to reach the issue of whether Bulman's blood-alcohol level was .23 at the time of driving, rather than at the time of the breath test, because if the relevant time is at the time of driving, by defendant's own admission and his expert's testimony, he did not consume enough post-accident alcohol to result in a BAC of .23. For the foregoing reasons, the trial court properly determined that Bulman did not establish a *prima facie* case for rescission based upon his alleged post-accident drinking.

■ ■ We also are not persuaded by Bulman's argument that the trial court erred in not rescinding his summary suspension because he introduced evidence that blood was allegedly in his mouth immediately before the breath test, thereby affecting the tests results, and that the

State did not rebut the evidence. The trial court specifically determined that "whatever defects there were [in the breath test], they seemed insufficient to excuse the results on this particular test as to make a finding of .10 or over .10 against the manifest weight of the evidence." There is insufficient reason for this court to second-guess the trial court's assessment of Bulman's credibility with respect to Bulman guessing that he tasted a blood "combination" in his mouth prior to taking the test. It is the function of the trier of fact to determine the credibility of the witnesses, the weight of their testimony and the inferences to be drawn from the evidence. (*People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733.) Consequently, this court will not substitute its judgment for that of the trier of fact regarding questions involving the evidence's weight or the witnesses' credibility.

■ Then, Bulman argues that the trial court erred in not rescinding his summary suspension on the grounds that the Illinois Department of Public Health Rules were violated. Bulman's argument is premised upon Dr. Brown's opinion that the certificate of analysis for lot No. 88—139 was scientifically inaccurate because one of the instruments was incorrectly recording or not calibrated properly. Consequently, Bulman asserts that the breath machine was not properly certified pursuant to Illinois Department of Public Health Rules. We disagree. The trial court's determination is supported by Dr. Grohlich's opinion. Dr. Grolich signed the certificate of analysis for lot No. 88—139, and he was of the opinion that the gas chromatographic result was "equivalent" to the value recorded for the breathalyzer; that the value recorded was different because of "a difference in paper work"; and that .1% stood for a concentration equivalent for the breathalyzer reading of .1 %. Moreover, the finder of fact was allowed to accept one expert's opinion over another. (*People v. Bouchard* (1989), 180 Ill. App. 3d 26, 35, 535 N.E.2d 1001.) With respect to the alleged violation, the trial court's determination was not against the manifest weight of the evidence.

■■ While Bulman contends that the trial court correctly determined that Officer Steiner arrested him in his home, he contends that Officer Steiner did not have probable cause. Section 11—501.1(a) of the Vehicle Code requires that a defendant must have been arrested for driving under the influence. (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501.1(a).) Section 11—501.1 of the Illinois Vehicle Code provides, in pertinent part:

> "(a) Any person who drives or is in actual physical control of a motor vehicle upon the public highways of this State shall be deemed to have given consent, subject to the provisions of Sec-

tion 11—501.2, to a chemical test or tests of blood, breath, or urine for the purpose of determining the alcohol, other drug, or combination thereof content of such person's blood if arrested, as evidenced by the issuance of a Uniform Traffic Ticket, for any offense as defined in Section 11—501 or a similar provision of a local ordinance. The test or tests shall be administered at the direction of the arresting officer. The law enforcement agency employing said officer shall designate which of the aforesaid tests shall be administered." (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501.1(a).)

An arrest for driving under the influence, of course, requires that the arresting officer have actual probable cause to believe that the defendant was driving under the influence, not whether the officer correctly articulated the basis for the arrest. *People v. Wolff* (1989), 182 Ill. App. 3d 583, 586, 538 N.E.2d 610.

Thus, as a preliminary issue, we must determine when Bulman was arrested. The test for arrest is whether, considering all of the circumstances surrounding the incident, a reasonable man, innocent of any crime, would have considered himself under arrest. (*People v. Goodman* (1988), 173 Ill. App. 3d 559, 561, 527 N.E.2d 1055.) Such circumstances may include the continuing possession of an individual's driver's license by a police officer, the handcuffing of the individual, or the placing of the individual into a squad car. (*Goodman*, 173 Ill. App. 3d at 561.) "The duration of the individual's detention also bears on whether the stop is merely investigatory or constitutes an arrest." *Goodman*, 173 Ill. App. 3d at 561.

We do not believe that a reasonable man, innocent of any crime, would have considered himself under arrest after considering: that Bulman was in fact involved in a severe car accident; that he deserted his car at the accident scene; that he voluntarily answered his home's front door about 15 minutes after he arrived home; that he invited Officer Steiner into his house; that he admitted that he voluntarily agreed to go the police station to fill out an accident report; that he stated that he did not recall being placed under arrest when Officer Steiner came to his house; and that he voluntarily accompanied Officer Steiner to the police station in the squad car because his car was damaged and deserted at the accident scene. These acts constituted an officer's investigation of a traffic accident. Consequently, we believe that Bulman was arrested by Officer Edwards at the police station and reverse the trial court's findings to that extent.

We address Bulman's erroneous argument that the arresting officer lacked probable cause. Probable cause exists where the

facts and circumstances known to the arresting officer are sufficient to warrant a man of reasonable caution to believe an offense was committed. (*People v. Sanders*, 176 Ill. App. 3d at 470.) The officer's subjective belief does not control. (*Wolff*, 182 Ill. App. 3d at 586.) The standard requires more than mere suspicion, but does not require the officer to have in hand evidence sufficient to convict. (*People v. Sanders*, 176 Ill. App. 3d at 470.) Additionally, circumstances observed after the act of driving can offer reasonable grounds upon which to conclude a defendant was driving while under the influence. (*Sanders*, 176 Ill. App. 3d at 470.) Further, "[a] court may place itself in the position of the arresting officer and, in light of the objective evidence, substitute its judgment on the issue of probable cause for the officer's judgment." *People v. Wolff* (1989), 182 Ill. App. 3d 583, 586, 538 N.E.2d 610.

■■■ Based upon Officer Edwards' sworn report, probable cause existed to arrest Bulman for driving under the influence when Officer Edwards' investigation established that Bulman was driving his car when he had an accident and that Bulman smelled strongly of alcohol. Similarly, in *People v. Wolff* (1989), 182 Ill. App. 3d 583, 538 N.E.2d 610 (where a police officer was informed that defendant Wolff had run his car off the road and that when the officer went to his home, the officer noticed a strong alcohol odor on defendant Wolff's breath), this court found that the combination of these factors was sufficient probable cause to believe that the defendant was driving under the influence. (*Wolff*, 182 Ill. App. 3d at 586.) Based on the foregoing, we conclude that the arresting officer had probable cause.

■■■ Again, Bulman contends that Officer Steiner was the arresting officer and that because Officer Edwards signed the law enforcement sworn report as the arresting officer, his summary suspension should be rescinded. As discussed above, this argument is without merit because Officer Edwards was the arresting officer.

For the reasons set forth above, the circuit court of Cook County's order denying Bulman's petition to rescind the statutory summary suspension is affirmed.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.