THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT HOOD, Defendant-Appellant.

Fourth District—No. 4—93—1063

Opinion filed June 30, 1994.

234

Michael R. Glenn, of Nokomis, for appellant.

Vince Moreth, State's Attorney, of Carlinville (Norbert J. Goetten, Robert J. Biderman, and James Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Defendant, Robert Hood, appeals from the denial of his petition to rescind the statutory summary suspension of his driving privileges. (625 ILCS 5/6—208.1, 11—501(c) (West 1992).) Hood challenges the validity of the stop of his motorcycle, as well as the admission of evidence of tests administered. We affirm.

# I. FACTS

On July 11, 1993, Officer Charles Leach stopped Hood while Hood was riding his motorcycle. After determining Hood might be under the influence of alcohol, he requested Hood to submit to several field-sobriety tests and a preliminary breath test (PBT). Hood could not successfully complete any of the tests and was arrested by Leach for driving under the influence of alcohol (DUI). (625 ILCS 5/11—501(a) (West 1992).) According to Leach, the warning to motorists was read to Hood, as required by statute. (625 ILCS 5/11—501.1(c) (West 1992).) Hood refused to submit to a breathalyzer test. Since Hood is not a first-time offender, his driving privileges were suspended for two years as the result of this refusal. (625 ILCS 5/6—208.1(a)(3) (West 1992).) Hood filed a motion to rescind the summary suspension.

The hearing on the petition occurred on September 1, 1993. Hood testified that on the afternoon of July 11, 1993, he attended a benefit at the Bunkhouse Tavern in Bunker Hill. The benefit was held for a woman who had allegedly been beaten up by the Saddle Tramps, a motorcycle gang. Hood stated the sponsors of the benefit were concerned the Saddle Tramps might disrupt the benefit. Hood testified "two different people had called me up who associate with the Saddle Tramps, and asked if I would basically come and basically bounce at the benefit." Hood testified he went to the benefit to act as a "bouncer," and would be responsible for removing any disruptive individuals. He stated he was with Carla Schmidt the entire time he was at the benefit. During this time he drank three bottles of Budweiser beer and ate one Sloppy Joe sandwich. Although the benefit had not ended, Hood left at 6 p.m. with Schmidt.

Hood and Schmidt rode on Hood's motorcycle to Alton, where they ate dinner at a Steak 'N Shake restaurant. After dinner they returned to Bunker Hill. In Bunker Hill they went to BJ's Tavern, arriving at 8:30 p.m. Between 8:30 p.m. and 9 p.m. they listened to a band and Hood drank two bottles of Budweiser beer. At 9 p.m., Hood left BJ's Tavern alone. Several minutes later, while driving out of town, Hood was stopped by Leach.

Hood testified that while driving out of town he obeyed the speed limit. He drove in the "low part" of second gear and estimated he traveled at a speed of 20 miles per hour. Although his motorcycle is not equipped with a speedometer, Hood testified he is able to gauge speed by monitoring the revolutions per minute shown on the tachometer.

Hood testified there are two positions on the ignition of his motorcycle. When the key is in the first position the motorcycle will run, but the headlight and brake light will not function. When the key is in the second ignition position the headlight and brake light

are also operational. Hood conceded the key was in the first ignition position when Leach examined the motorcycle after stopping him. However, Hood explained it had been in the second position while he was driving. When Leach stopped him he turned the key from the second to the first position out of habit. He did not, however, turn off his motorcycle completely. According to Hood, when Leach told him the brake light did not work, Hood told Leach the key had to be turned to the second ignition position. The key was placed in the second ignition position, and Hood demonstrated to Leach the brake light did in fact work.

Hood testified that once he demonstrated the brake light was functional, Leach said "well, you have no rearview mirror." Hood explained his mirror had fallen off while he was riding the motorcycle. Leach then told Hood he did not have a muffler, he had an odor of alcohol on his breath, and Leach was going to arrest him for DUI.

Hood testified he was not intoxicated, and explained his slurred speech, stating he has a "thicker tongue" than most people as the result of a triple fracture to the side of his face which left him with no feeling in his lip or cheek. His face becomes more numb when it is in the wind.

Hood testified he performed various field-sobriety tests. First he performed the "heel-to-toe" test. When Leach said it "wasn't good enough," Hood repeated the test. Hood testified "[t]o my knowledge I thought I was doing it right." However, Hood explained he had previously injured his back at work and was stiff when he got off the motorcycle. On cross-examination he conceded he had not sought medical attention for his injury, explaining he had just begun working for a new company and "didn't want to bother them." He also conceded his back injury did not prevent him from being the bouncer at the Bunkhouse Tavern, nor did it impair his balance or his ability to walk.

Hood testified he performed a "one-leg-stand" test. He stated, "I went on one foot four seconds and he didn't say anything. I don't know how he expected me to stay up on one foot."

Hood testified Leach never read the warning to motorists as required by statute, but merely stated if Hood had more than one DUI in 10 years he would lose his license for two years if he refused to submit to the breathalyzer test.

According to Hood, on the day following his arrest for DUI, Hood had the motorcycle examined by an individual who found the brake light to be operational.

Charles Leach testified he began following Hood's motorcycle when he noticed it did not have a muffler. He used a stationary radar

to determine Hood's speed and found Hood travelled at 35 miles per hour in a 25-mile-per-hour zone. When Hood stopped at a stop sign, Leach noticed Hood's brake light did not work. Leach believes a brake light is important on a motorcycle and decided to make an enforcement stop. Before Leach stopped Hood, Hood accelerated to a speed in excess of 30 miles per hour.

Leach stopped Hood and told him his brake light did not work. Hood seemed genuinely surprised. Leach asked Hood to demonstrate the light did work. Although Hood attempted to do so, when he pressed the brake pedal, the brake light did not operate. Leach told Hood he would issue a written warning. During the conversation with Hood, Leach detected an odor of alcohol on Hood's breath and noticed Hood's speech was slurred. Leach decided that, before confronting Hood with the issue of whether he was DUI, he would perform a license check on Hood to learn more about him. The license check revealed there was a caution associated with Hood regarding possible motorcycle gang activity. Hood called for backup. Once another police officer arrived, Leach resumed his conversation with Hood. He told Hood it smelled like he had been drinking. Hood admitted to drinking "a beer or two," or some nominal amount of alcohol. Leach requested Hood to perform several field-sobriety tests.

The first test administered was the horizontal gaze nystagmus (HGN) test, which involves watching the movement of the motorist's eyes as they follow an object. Hood failed this test. The defense objected to testimony regarding the HGN test on the basis it is not reliable. The objection was overruled.

The next test was the one-leg-stand test. Leach demonstrated and explained the test, instructing Hood to stand on one leg for 30 seconds. Although he made several attempts, Hood could not stand on one leg for more than four or five seconds.

The third test was the "walk-the-line" or "walk-and-turn" test. Hood failed this test as he was unable to walk heel to toe, did not walk in a straight line, and had to raise his arms to maintain his balance.

Finally, Leach administered a PBT. Leach testified Hood had not ingested anything for a period of 20 minutes prior to submitting to the test. The defense objected to testimony regarding the PBT on the basis it is not scientifically reliable. The objection was overruled. The defense then objected on the basis of lack of foundation. In overruling the objection, the court noted "[t]his is for reasonable grounds. This is not for beyond a reasonable doubt." Leach testified Hood submitted to the test, which revealed a blood-alcohol content (BAC) of .224. Leach arrested Hood for DUI.

After Hood was arrested and a tow truck had arrived to transport Hood's motorcycle, Hood stated he felt it was unfair he had been stopped for speeding and insisted his brake light worked. Hood was adamant his brake light worked and demanded that Leach check it. Leach acquiesced. In the first ignition position, the brake light did not work. However, Leach owns a motorcycle of the same model and was aware there were probably two ignition positions. When he turned the key to the second ignition position, the brake light was operational.

Leach testified he read the warning to motorists to Hood at the jail. Hood refused to submit to the breathalyzer test.

Leach acknowledged the Bunker Hill police department was concerned the Saddle Tramps might be in the area and motorcycles had "higher profile" than normal at the time.

In rebuttal, John Jolliff testified he checked Hood's motorcycle on July 12, 1993, and found the brake light operational. Jolliff also testified if a person is "jerking a change in second, you can't be doing over 20, 25 miles [per hour]." Carla Schmidt testified she saw Hood arrive at the Bunkhouse Tavern at 4:30 p.m. on July 11, 1993. Schmidt testified Hood had "a beer, maybe two or three" at the Bunkhouse Tavern and was socializing, meeting with people and drinking beer like everybody else. Schmidt believed Hood drank Busch beer. At 6 p.m. Schmidt rode with Hood to Alton to eat at Steak 'N Shake, and back to Bunker Hill where they went to BJ's Tavern. Hood had one or two bottles of beer at BJ's Tavern. Schmidt testified Hood's speech was not slurred and she felt comfortable riding on his motorcycle.

At the close of the hearing the trial court found the reasons for the stop and for giving the field-sobriety tests were valid. The trial court found Leach read the warning to motorists and Hood refused to submit to the breathalyzer test. The trial court, therefore, denied Hood's petition.

On September 29, 1993, Hood filed a motion to reconsider, alleging he had not received discovery to which he was entitled and his arrest was a pretext arrest for which no probable cause existed.

The motion was denied on November 1, 1993. A notice of appeal was filed on November 30, 1993. Hood appeals, alleging Leach did not have the requisite reasonable suspicion to stop him, and the evidence regarding the HGN test and the PBT should not have been admitted as the State did not lay a proper foundation or establish their scientific reliability.

## II. COMPLETENESS OF RECORD

The State initially contends Hood has waived appellate consideration of his arguments as he has not provided this court with the complete record. Specifically, the transcript of the hearing on the motion to reconsider is not before us. The State cites several cases which stand for the proposition it is the appellant's responsibility to provide a complete record and any doubts arising from the provision of an incomplete record must be resolved against the appellant.

There is no requirement under the supreme court rules that the record on appeal contain a transcript of proceedings unless review is requested of matters required to be included therein. (*Kuhlman v. Cotter* (1968), 92 Ill. App. 2d 475, 477, 234 N.E.2d 815, 816.) Moreover, while it is the duty of the party seeking review to present an adequate record to the reviewing court, the absence of a transcript of proceedings will only prevent the appellate court from reviewing issues for which evidence may be necessary. *Woodfield Ford, Inc. v. Akins Ford Corp.* (1979), 77 Ill. App. 3d 343, 347, 395 N.E.2d 1131, 1134.

A similar argument to that raised by the State was presented in *Korogluyan v. Chicago Title & Trust Co.* (1991), 213 Ill. App. 3d 622, 627, 572 N.E.2d 1154, 1159. In *Korogluyan,* the appellee argued the appellate court did not have a sufficient basis upon which to review the trial court's decision where the record on appeal did not include a transcript of a hearing at which the court heard the attorney's arguments with respect to a motion for summary judgment. The appellate court found that where the trial judge's decision is based solely upon the pleadings and affidavits, and no evidence has been heard, the appellate court may review the issues of law without a report of proceedings. *Korogluyan,* 213 Ill. App. 3d at 627, 572 N.E.2d at 1159.

●1 In the present case, the errors alleged by Hood occurred at the hearing on the petition to *rescind* the summary suspension, not at the hearing on the motion to *reconsider.* A transcript of the hearing on the petition to rescind has been provided to this court. The record contains the written motion to reconsider, as well as the denial of this motion. The State has not alleged the trial court received any additional evidence at the hearing on the motion to reconsider. The absence of a transcript of the hearing on the motion to reconsider does not preclude our review of the propriety of the trial court's admission of evidence during, and decision following, the hearing on the petition to rescind the summary suspension.

## III. ESTOPPEL

The State contends Hood has waived any allegations the trial

court erred in determining Leach had reasonable suspicion to stop him because Hood pleaded guilty to reckless driving, admitting he drove his motorcycle in an unlawful, reckless manner at the date and time in question. Although this argument is framed in terms of waiver, it is actually in the nature of estoppel.

●2 The doctrine of judicial estoppel provides that once having affirmed under oath that a particular state of facts exists, a party may not later assert the contrary is true. (*De Witt County Public Building Comm'n v. County of De Witt* (1984), 128 Ill. App. 3d 11, 25, 469 N.E.2d 689, 699.) This doctrine prevents a party from maintaining inconsistent positions in separate judicial proceedings. Thus, when a party assumes a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter assume a contrary position. The doctrine of judicial estoppel rests upon public policy which upholds the sanctity of the oath, and its purpose is to bar as evidence statements and declarations which would be contrary to sworn testimony the party has given in the same or previous judicial proceedings. The courts will not tolerate a situation where a party to a lawsuit swears to the untruth of a matter, and then, in another lawsuit swears to the truth of the same matter. *Finley v. Kesling* (1982), 105 Ill. App. 3d 1, 9, 433 N.E.2d 1112, 1119.

The State argues since, in the criminal proceedings which occurred *after* the suspension hearing but before the filing of this appeal, Hood admitted he drove his motorcycle recklessly, he is now estopped from arguing the trial court erred in finding the officer had reasonable suspicion to effect the initial stop. Usually the issue of estoppel is raised where the criminal proceedings are held *prior* to the hearing on the petition to rescind the summary suspension. (See *People v. Lazzara* (1986), 145 Ill. App. 3d 677, 681, 495 N.E.2d 1144, 1146-47; *People v. Powell* (1982), 107 Ill. App. 3d 418, 419-20, 437 N.E.2d 1258, 1260.) In *Lazzara*, the court determined a plea of guilty to DUI was a stipulation the police officer had probable cause to arrest the defendant and could be used in the implied-consent proceeding to establish the officer had probable cause to arrest the defendant. (*Lazzara*, 145 Ill. App. 3d at 681, 495 N.E.2d at 1146-47.) Thus, in *Lazzara*, the defendant's guilty plea effectively estopped him from contending, in the implied-consent proceedings, the officer lacked probable cause to arrest him. Similarly, in *Powell*, the court found the defendant's plea of guilty to DUI was a judicial admission and could be used in the implied-consent proceeding to estop the defendant from alleging lack of probable cause. *Powell*, 107 Ill. App. 3d at 419, 437 N.E.2d at 1260.

●3 In the present case, it is inconsistent for Hood to allege in the

proceedings on his petition to rescind the officer lacked reasonable suspicion to stop him because he was doing nothing wrong, and then to admit in the criminal proceedings he committed the offense of reckless driving. Whether a subsequent plea of guilty in criminal proceedings estops a defendant from appealing the decision of the court in earlier implied-consent proceedings does not appear to have been resolved by the courts of this State. However, we need not resolve this issue in the present case as Hood's plea of guilty to reckless driving in the criminal proceeding is absent from the record on appeal; no motion to supplement the record has been filed. Since we have no record of Hood's alleged plea of guilty to reckless driving, we decline to hold such a plea estops him from pursuing an appeal of issues resolved in the proceedings on the petition to rescind the summary suspension. Accordingly, we address the merits of Hood's argument that the trial court erred in finding the officer had reasonable suspicion that he had committed a criminal offense.

## IV. REASONABLE SUSPICION

Hood contends he is entitled to rescission of the summary suspension because Leach lacked reasonable suspicion of criminal activity to justify the stop of his motorcycle. The summary suspension hearing is civil in nature and the individual requesting rescission of the suspension bears the burden of proving his case by a preponderance of the evidence. (See *People v. Burke* (1991), 220 Ill. App. 3d 839, 846, 581 N.E.2d 304, 309.) The trier of fact's finding with respect to whether the petitioner met his burden of proof will only be reversed if it is against the manifest weight of the evidence. A finding is against the manifest weight of the evidence where an opposite conclusion is clearly evident from the record. *People v. Bulman* (1991), 212 Ill. App. 3d 795, 801, 571 N.E.2d 850, 855.

A police officer may make a valid traffic stop where the officer is able to point to specific and articulable facts which, when taken together with the rational inferences therefrom, reasonably warrant the stop of the defendant's vehicle. Generally, a traffic violation provides a sufficient basis for a traffic stop. (*People v. Rotkvich* (1993), 256 Ill. App. 3d 124, 129, 628 N.E.2d 888, 892.) Specifically, where an officer observes the defendant's vehicle traveling in excess of the posted speed limit, the officer has more than reasonable suspicion to believe the defendant has committed an offense, and may stop the defendant's vehicle. (See *People v. Stewart* (1993), 242 Ill. App. 3d 599, 604, 610 N.E.2d 197, 201.) Thus, the investigatory stop of a vehicle traveling in excess of the posted speed limit is proper. (*People v. O'Brien* (1992), 227 Ill. App. 3d 302, 306, 591 N.E.2d 469, 472.)

Additionally, it is proper for an officer to stop an individual driving a vehicle where the officer's observation of the vehicle leads the officer to have reasonable suspicion to believe the individual is violating laws requiring safe vehicles and vehicles that do not make excessive or unusual noise. (*People v. Houlihan* (1988), 167 Ill. App. 3d 638, 645, 521 N.E.2d 277, 282.) Moreover, that the officer did not charge the defendant with the traffic violation which precipitated the stop which ultimately resulted in an arrest for DUI is not relevant to whether the officer had reasonable suspicion to make the stop. An officer need not charge a minor violation when, after a stop, he discovers a serious one. *People v. Repp* (1988), 165 Ill. App. 3d 90, 96, 518 N.E.2d 750, 755.

•4 In the present case, Leach testified he used a stationary radar to detect the speed of Hood's motorcycle. The radar indicated Hood's motorcycle traveled at 35 miles per hour, 10 miles per hour in excess of the posted speed limit. He also observed the brake light did not function and the motorcycle did not have a muffler. Leach therefore witnessed Hood commit three offenses: violation of the speed limit as well as laws requiring safe vehicles and vehicles which do not make excessive or unusual noise. Since Leach witnessed Hood commit these offenses, he had more than reasonable suspicion to believe Hood had committed violation of the traffic laws and, therefore, properly stopped Hood's motorcycle.

Hood, while conceding his motorcycle does not have a muffler, contends he did not exceed the speed limit and his brake light was functioning properly. Evidence in support of Hood's contentions was submitted to the trial court. The trial court is in the best position to assess the credibility of the witnesses and weigh the evidence. (*People v. Collins* (1985), 106 Ill. 2d 237, 261-62, 478 N.E.2d 267, 277.) By finding the reasons for the stop were valid, the trial court implicitly resolved issues of credibility in favor of the testimony of Leach. We do not find the trial court's resolution of the issues manifestly erroneous and therefore affirm the trial court's finding that Hood failed to prove, by a preponderance of the evidence, Leach lacked reasonable suspicion to make the initial traffic stop.

## V. WAIVER

Hood next contends the trial court erred in overruling his objections to the admission of testimony that Hood was unable to successfully complete the HGN test and the PBT. The State contends Hood has waived any argument regarding the admissibility of the HGN test and the PBT because he did not raise these arguments in his motion to reconsider. The State alleges that since the notice of

appeal was filed within 30 days of the motion to *reconsider*, but more than 30 days after the entry of the *original* order denying the petition to rescind, the notice of appeal is effective only as to those issues raised in the motion to reconsider.

•5 Initially, we note that unlike appeals from convictions and sentences imposed upon a plea of guilty, where the filing of a motion to reconsider is a mandatory prerequisite to filing an appeal (134 Ill. 2d R. 604(d)), a motion to reconsider need not be filed in civil actions, including proceedings for the rescission of the summary suspension of driving privileges. Where a motion to reconsider is required to be filed, those issues not raised in the motion are waived. (See *People v. Bronson* (1991), 216 Ill. App. 3d 839, 842, 576 N.E.2d 449, 451.) However, the State has cited and we have found no authority for the proposition that where an optional motion to reconsider is filed, those issues not raised in the motion are waived. We decline to set such a precedent in this case.

A motion to reconsider is a post-trial motion. A motion qualifies as a post-trial motion if it requests one or more of the types of relief authorized in section 2—1203 of the Code of Civil Procedure (Code) (735 ILCS 5/2—1203 (West 1992)). (*Hanna v. American National Bank & Trust Co.* (1988), 176 Ill. App. 3d 938, 942, 531 N.E.2d 961, 964.) Section 2—1203 of the Code provides for motions for rehearing, retrial, modification, vacation, or other relief. A motion to reconsider the denial of a petition to rescind the summary suspension of driving privileges is in the nature of a motion to modify or vacate. When such a post-trial motion is filed, it tolls the time for the filing of a notice of appeal. (*Hanna*, 176 Ill. App. 3d at 942, 531 N.E.2d at 964; 134 Ill. 2d R. 303.) Thus, by filing a motion to reconsider within 30 days of the entry of the order denying the petition to rescind, Hood tolled the time for the filing of a notice of appeal *from the order denying his petition to rescind*. Once the court ruled on the motion to reconsider, the clock began to run again. Since the notice of appeal was filed within 30 days of the denial of the post-trial motion, it was timely filed. The State has cited and we have found no authority which would support the State's contention the filing of a post-trial motion tolls the time for the filing of a notice of appeal only as to those matters raised in the post-trial motion, but not as to any other matters of which review is desired. Moreover, had Hood filed a notice of appeal while his post-trial motion was pending, his appeal would have been dismissed as premature. Accordingly, we reject the State's argument that, due to his decision not to pursue these issues in his nonobligatory motion to reconsider, Hood waived appellate consideration of whether evidence regarding the HGN test and the PBT was erroneously admitted.

## VI. ADMISSIBILITY OF THE HGN TEST

Hood contends testimony regarding the HGN test was improperly admitted as the State failed to lay a proper foundation for the test, including evidence of its scientific reliability. We find the trial court properly overruled Hood's objection to admission of evidence regarding the HGN test based on lack of scientific reliability. Hood waived appellate consideration of whether the State failed to lay a proper foundation for this evidence, due to his failure to object on this basis at the hearing.

"Nystagmus" is a term used to describe an involuntary jerking of an eyeball, and can be caused by the ingestion of drugs or alcohol. HGN is the inability of the eyes to maintain visual fixation as they are turned from side to side or move from center focus to the point of maximum deviation at the side. (*People v. Buening* (1992), 229 Ill. App. 3d 538, 539, 592 N.E.2d 1222, 1223.) The HGN test, as administered by law enforcement officers, consists of the officer instructing the subject to focus on an object, such as a pen, while the officer moves the object out of the subject's field of vision. By observing (1) the inability of each eye to track movement smoothly, (2) pronounced nystagmus at maximum deviation and (3) onset of nystagmus at an angle less than 45 degrees in relation to the center point, the officer can estimate whether the subject's BAC exceeds the legal limit of .10%. *Buening*, 229 Ill. App. 3d at 539-40, 592 N.E.2d at 1223.

Citing *Buening* (229 Ill. App. 3d at 545-46, 592 N.E.2d at 1227), Hood alleges testimony regarding the HGN test is only admissible where a foundation has been laid, which includes, at a minimum, the officer's education and experience in administering the test, as well as evidence the test was properly administered. He relies upon *People v. Vega* (1986), 145 Ill. App. 3d 996, 1000-01, 496 N.E.2d 501, 504-05, for the proposition this foundation must include expert testimony regarding the scientific validity of the test.

*Buening* and *Vega* involved the issue of whether the evidence regarding the HGN test could be used, in criminal prosecutions for DUI, to prove an element of the offense, namely, that defendant was under the influence of alcohol. They did not address the foundational requirements for the admission of evidence regarding the HGN test in an implied-consent proceeding.

In *Vega*, the defendant appealed the admission of testimony regarding her performance of the HGN test; she alleged the test was not generally accepted in the scientific community. (*Vega*, 145 Ill. App. 3d at 999, 496 N.E.2d at 504.) This court declined to determine the validity and admissibility of the HGN test, concluding it was

error to admit the results of the test, as an adequate foundation had not been laid. (*Vega*, 145 Ill. App. 3d at 1001, 496 N.E.2d at 505.) In reaching this conclusion, we noted when testimony regarding matters beyond the knowledge of the average individual is sought to be introduced, a proper foundation by way of expert testimony is required. This is especially true of technological evidence, as it is the natural inclination of jurors to regard such evidence as extremely trustworthy. (*Vega*, 145 Ill. App. 3d at 1000, 496 N.E.2d at 504.) Although the admission of testimony regarding the results of the HGN test was found to be erroneous, the error was harmless as there was sufficient other evidence, including the defendant's failure of the "walk-the-line," "one-leg-stand" and "finger-to-nose" tests, to support the jury's verdict of guilt. *Vega*, 145 Ill. App. 3d at 1001, 496 N.E.2d at 505.

In *Buening*, the Fifth District Appellate Court found the HGN test is sufficiently reliable to meet the standards for admissibility set forth in *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013. (*Buening*, 229 Ill. App. 3d at 545-46, 592 N.E.2d at 1227.) The *Frye* test requires general acceptance of the scientific principle and procedure by the relevant scientific communities. (*Buening*, 229 Ill. App. 3d at 541-42, 592 N.E.2d at 1225.) The fifth district noted according to the United States Department of Transportation Test Manual, the HGN test is the single most accurate field test used in determining whether a person is alcohol impaired. When the HGN test is used in conjunction with the walk-and-turn field-sobriety test, an officer's ability to detect whether an individual is under the influence of alcohol is improved. (*Buening*, 229 Ill. App. 3d at 545, 592 N.E.2d at 1227.) Thus, the court concluded HGN test results may be admitted as evidence of intoxication, as is any other evidence of a defendant's behavior, as long as a proper foundation has been laid. The court explained a proper foundation should include a description of the officer's education and experience in administering the test and a showing the test was properly administered. *Buening*, 229 Ill. App. 3d at 546, 592 N.E.2d at 1227-28.

●6 In the present case, the proceeding was not a criminal prosecution for DUI where the defendant must be proved, by the State, to have been under the influence of alcohol. Leach's testimony that the HGN test was administered and that Hood was unable to successfully complete this test was not admitted as evidence of intoxication. Instead, the testimony was admitted with respect to whether Leach had probable cause to believe Hood was under the influence of alcohol.

As the fifth district determined the HGN test was sufficiently

reliable to meet the *Frye* standard for admissibility in criminal proceedings, we are persuaded it is sufficiently reliable to be admitted in implied-consent proceedings; thus, where evidence involving the HGN test is sought to be admitted in implied-consent proceedings, the State need not call an expert witness to attest to its reliability. Accordingly, the circuit court properly overruled Hood's objection based on lack of scientific reliability.

Although the State failed to lay the foundation described in *Buening* (*e.g.*, officer's education and experience and proper administration of the test) for the admission of the results of the HGN test, Hood failed to preserve this issue for appellate review as he did not object to the admission of the results of the HGN test on this basis.

## VII. ADMISSION OF THE PBT

Hood contends the court erred in admitting the results of the PBT, as the State failed to establish a proper foundation, including the officer's training, experience, and proper administration of the test, as well as the scientific reliability of the PBT.

The legislature has specifically authorized the use of the PBT if there is probable cause to believe the motorist committed the offense of DUI. The purpose of the administration of the PBT is to assist the law enforcement officers in the determination of whether to require a chemical test as authorized under sections 11—501.1 and 11—501.2 of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/11—501.1, 11—501.2 (West 1992)) and the appropriate type of test to request. In other words, where the officer has probable cause to believe the motorist is under the influence of some substance, but is uncertain whether that substance is alcohol which would be detected in a breathaylzer test, or cannabis or a controlled substance which would not be detected in a breathalyzer test, the officer may utilize the PBT to assist him in the determination of whether to request the motorist to submit to a breathalyzer test or another chemical test.

The PBT is, therefore, different from field-sobriety tests, such as the walk-and-turn, one-leg-stand and HGN tests, which are tools an officer may utilize to determine *whether* there is probable cause to believe the motorist is under the influence of alcohol or another substance. The field-sobriety tests are used to determine whether there is probable cause to believe the motorist has committed the offense of DUI, so they are admissible with respect to this issue in implied-consent proceedings.

The statute provides the results of the PBT may be introduced, by the *motorist*, in any administrative or court proceeding involving a violation of section 11—501 or 11—501.1 of the Vehicle Code (625

ILCS 5/11—501 (West 1992)). (625 ILCS 5/11—501.5 (West 1992).) The statute is, however, silent as to whether, and under what conditions, the results of the PBT may be introduced by the State in administrative and court proceedings. Nor has this issue been addressed by the courts of this State. The briefs submitted by the parties provide little assistance in resolving this issue.

●7 As the legislature has authorized use of the PBT only *after* the officer had probable cause to believe the motorist committed the offense of DUI, we query whether the results of the PBT may be admitted by the State in an implied-consent proceeding to bolster the officer's determination of probable cause. Fortunately, we need not resolve the issue of the admissibility of the results of the PBT in implied-consent proceedings, nor need we define the foundational requirements to determine whether scientific testimony regarding the reliability of the PBT is required. Rather, assuming *arguendo* the results of the PBT were erroneously admitted, the other evidence presented was more than adequate to establish Leach had probable cause to believe Hood was under the influence of alcohol. Thus, even were we to accept Hood's contention on appeal, reversal of the denial of his petition for rescission would not be warranted.

## VIII. PROBABLE CAUSE

Hood contends the evidence at the implied-consent hearing was inadequate to demonstrate Leach had probable cause to believe he had committed the offense of DUI because the evidence did not establish Leach had probable cause to believe Hood was under the influence of alcohol. As noted above, in implied-consent proceedings, the burden of proof is on the petitioner (*Burke*, 220 Ill. App. 3d at 846, 581 N.E.2d at 309), and the circuit court's determination of whether the petitioner met that burden of proof will not be reversed unless it is manifestly erroneous. *Bulman*, 212 Ill. App. 3d at 801, 571 N.E.2d at 854-55.

Thus, in order to be entitled to rescission of the summary suspension, Hood had to prove, by a preponderance of the evidence, that Leach did not have probable cause to believe he was under the influence of alcohol. Probable cause to make an arrest exists when a reasonably prudent person, having the knowledge possessed by the officer at the time of the arrest, would have believed the individual committed the offense. *People v. Montgomery* (1986), 112 Ill. 2d 517, 525, 494 N.E.2d 475, 477.

●8 Contrary to Hood's assertions on appeal, the evidence that Hood was not under the influence of alcohol was not uncontroverted. Although Hood presented evidence he was not under the influence of

alcohol, even without considering the results of the PBT, there was ample evidence that Leach had probable cause to believe Hood was under the influence of alcohol. Specifically, the court could have concluded the evidence that Hood smelled of alcohol, had slurred speech, was unaware he had not turned his key to the proper ignition position to activate his brake light, and failed the one-leg-stand and walk-and-turn field-sobriety tests provided Leach with probable cause to believe Hood was under the influence of alcohol.

Hood disputed portions of Leach's testimony and offered a series of excuses for his speech and failure of the field-sobriety tests. Specifically, Hood disputed Leach's testimony that his brake light was not working. Hood explained his slurred speech, stating he has a "thicker" tongue than most people as the result of multiple fractures which he suffered at an earlier time. Hood explained his failure of the walk-and-turn and one-leg-stand field-sobriety tests referencing a back injury for which he sought no medical attention, and which, by his own admission, did not impair his ability to walk, his balance, or his ability to work as a "bouncer." Hood also disputed Leach's testimony that he was unable to perform the walk-and-turn test, stating "[t]o my knowledge I thought I was doing it right." With respect to the one-leg-stand test, Hood testified "I don't know how he expected me to stay up on one foot." When evidence in exculpation is offered, issues of credibility are raised which the trial court is in the best position to resolve. In the present case the trial court resolved those issues against Hood and we find no reason to reverse its findings. See *Vega*, 145 Ill. App. 3d at 1001, 496 N.E.2d at 505.

## IX. CONCLUSION

For the foregoing reasons, the order of the circuit court of Macoupin County denying Hood's petition for rescission of the summary suspension is affirmed.

Affirmed.

LUND and GREEN, JJ., concur.