THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DOUGLAS SMITH, Defendant-Appellant.

Second District   No. 2—88—0395

Opinion filed May 9, 1989.

Terry A. Ekl and Paul P. Moreschi, both of Connolly, Ekl & Williams, P.C., of Clarendon Hills, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE NASH delivered the opinion of the court:
After trial by jury defendant, Douglas Smith, was convicted of driving while under the influence of alcohol (Ill. Rev. Stat. 1985, ch. 95½, par. 11—501(a)(2)) and was sentenced to a one-year term of probation conditioned on service of 30 days periodic imprisonment, alcohol evaluation, counseling, and payment of court costs. Defendant ap-

peals, contending that his trial counsel was so inadequate and incompetent as to deprive defendant of his right to counsel and a fair trial.

Defendant was charged by complaint with the offenses of driving under the influence of alcohol (Ill. Rev. Stat. 1985, ch. 95½, par. 11—501(a)(2)), transportation of alcoholic liquor in a motor vehicle (Ill. Rev. Stat. 1985, ch. 95½, par. 11—502(a)), and driving on the wrong side of a roadway (Ill. Rev. Stat. 1985, ch. 95½, par. 11—701(a)). The State's sole witness was Sergeant Carl Dillenkoffer, the arresting officer, who testified that on December 19, 1986, at approximately 2:15 a.m., while driving east on Roosevelt Road, he saw a car backing rapidly out of the driveway of the Egghead Software store building onto Roosevelt Road. As it was backing up, the car went over the curb, then drove off the grass abruptly. The car then crossed over the two westbound lanes of Roosevelt Road and the center of the roadway and drove west in the eastbound lane towards the officer's squad car. Dillenkoffer flashed his headlights, and the car returned to the westbound lanes, crossed them and hit the curb before it straightened out. Dillenkoffer stated that he turned his car around and activated his red lights for the car to pull over. When the car pulled over, it again hit the curb.

Sergeant Dillenkoffer further testified that defendant was the driver of the car and, when he got out, the officer noticed defendant had difficulty walking. When asked to produce his driver's license, defendant handed the officer an American Express credit card; it was returned to defendant, and he then fumbled through his wallet before producing the license. The officer noticed that defendant's eyes were very bloodshot and glassy; his speech was slurred and there was a strong odor of alcohol on defendant's breath. The officer also noticed that defendant was wet from the groin area down his right leg, as if he had voided himself, and the officer later confirmed at the station that defendant had done so.

When asked to perform a balancing and a walk and turn test, defendant told the officer he had a physical condition where one leg was shorter than the other, and several toes had been removed from one foot, so he could not properly perform the tests. Officer Dillenkoffer then had defendant perform a field sobriety test called the horizontal gaze nystagmus test (HGN).

When the officer testified that defendant failed the test and was placed under arrest, defendant's trial counsel, John A. Myers, Jr., objected to the lack of foundation for the conclusion defendant failed the test, and it was sustained by the trial court. The State then asked the witness to describe the HGN test and he responded:

"Okay. In the horizontal gaze nystagmus, you are looking at an individual's eyes, and you are observing three different things. You are observing what's called smooth pursuit, in which placing an object in front of your nose, directly in contact with the front of your nose, about four or five inches away, you move that object—in this particular case I used a pen light—left and right. And during the course of that movement from left to right, you are watching the eyes to see how smoothly they pursue that object being moved in front of them. There are two points available for that particular test, because there are two eyes. You are basing it on the left and the right eye. The word smooth pursuit is used because a person who has had some degree of alcohol, within the system, introduced to his body—the movement is not smooth. It's erratic and it's jerky and it moves like this, in this fashion. The more or the faster the jerk, the more alcohol influences that particular nerve. The second part of that test is while doing that same test, you are looking for what's called the angle of onset, the point at which, in looking at that eye from 45 degrees, it starts to become jerky, more movement, more action. Then you are looking for the maximum deviation. The maximum deviation is once it's brought out—at what point here, towards the eye—this here is zero, go all the way out is complete 90, at 45 is just to the side here. You are looking for the amount of erratic eye movement when an individual is moving the eye. Therefore, in the test, you are going to the left and to the right of the individual as you are performing that test. In each of those there are two points: smooth pursuit, two points; angle of onset, two points; and maximum deviation, two points. If all points are present, then an assumption at this point, solely an assumption, can be determined that the individual may perhaps be under the influence of alcohol."

Officer Dillenkoffer also described the training he had received in administration of the test, as follows:

"I received it at the Kane County Sheriff's Office, where I was instructed by two certified instructors in that. The classroom involved both written and verbal instructions, as well as practical exercises in which he had five different people come in. They had in fact been allowed to consume different quantities of alcohol, and prior to entering the room, they, in fact, submitted to breath analysis to determine the level of intoxication of each of these individuals. They came in to us as a class-

room of students, whereupon we tested their eyes and looked for the particular points that I just mentioned, and then we would then score them as well as make an assumption at that point that they are either over the legal limit of .10 or under the legal limit. And then the instructors had in there one person who had just had one small sip of wine but still emitted the breath, to throw in as like a control-type situation, just to see if we were reading the eyes properly. It also involved viewing of several films in which just eyes alone were the projection on the screen, and again, the same situation. The camera was being used at that point as the focus point on the individual. We would base our assumption based on those eyes and make a determination as to how many points we would grade them, and that was graded against what those points exactly were and actually were."

The officer testified further that, at the scene of the arrest, defendant said he had been drinking and that the officer had examined a glass which was on the floor of defendant's car containing a liquid having the odor of alcohol, possibly bourbon or whiskey. The officer stated he had many occasions to observe persons who were under the influence of alcohol in his 18 years as a police officer and, in his opinion, defendant was in that condition at his arrest. The officer's opinion as to the intoxication of defendant was based upon the results of the horizontal gaze nystagmus test he had performed on defendant, who had failed all six points of it, and also upon the other indicia of intoxication the officer had noted in his testimony. Officer Dillenkoffer advised defendant of the "Warnings to Motorists" and requested that he submit to a breathalyzer test. Defendant refused to do so.

On cross-examination, defendant's trial counsel questioned Sergeant Dillenkoffer further as to his training in administering the HGN test, and the officer testified he had no training relating to other medical conditions which could cause the nystagmus condition of a person's eyes, which was attributed here by the officer to defendant's consumption of alcohol.

The State rested its case, and defendant called Dr. Bernard G. Milton, who was defendant's physician and testified as an expert witness about defendant's diabetic condition. Milton testified that defendant had several toes amputated as a result of diabetes-related gangrene. He had been diabetic since 1972 and also suffered from Legge-Perthes disease, which resulted in one of defendant's legs being significantly shorter than the other.

Milton further testified as to the physical effects of diabetes, stating that it is dangerous for a diabetic person's blood sugar to be too high or too low. He stated that diabetes causes the development of ketones in the lungs of the patient, and they are a form of organic compound which are commonly known as alcohol. Acetone is one of the ketones produced by the body, and, as a result of the abnormal production of acetone, a breath analysis for alcohol would not give an accurate reading of the diabetic person's blood-alcohol content. Milton stated that a blood test is a more accurate way to test a diabetic person's blood-alcohol content.

Dr. Milton further testified that the acetone produced in the lungs causes a diabetic's breath to smell like alcohol. He stated that when a person is suffering from hypoglycemia, which is low blood sugar, he may speak with slurred speech and have difficulty with coordination. Hypoglycemia may also cause altered thinking or a stupor which could make the diabetic appear intoxicated. The doctor stated that if a patient is hypoglycemic, he would have to urinate frequently and that it is difficult for a physician to determine whether a diabetic person is hypoglycemic or intoxicated without performing a blood test. Dr. Milton testified that diabetes could also worsen a patient's vision and could result in blindness due to damage to the retina. The doctor did not know if such retinopathy would have an effect on performance of the HGN test.

On cross-examination, Dr. Milton stated that he had not examined the defendant for three months prior to his arrest and agreed with a treatise that stated that when the liver of a diabetic person is processing alcohol, it cannot release its supply of glycogen, a substance which is turned into glucose by the body, and causes a lowered blood-sugar level. Consequently, diabetics must be very careful when they drink alcohol to prevent becoming hypoglycemic. The State also asked Milton if diabetic retinopathy, damage to the retina caused by diabetes, would affect the ability of the eye to move, and the doctor responded that it would not. Milton stated that he did not know if defendant suffered from retinopathy.

On redirect examination, defendant's counsel asked Dr. Milton whether retinopathy would restrict the amount of light a person could see. The doctor replied that it could. When asked whether such a condition would restrict the ability to respond to a small moving light near the eye, Milton responded that he could not answer the question.

After Dr. Milton testified, defense counsel made a motion *in limine,* arguing:

"My defendant does not know at this time if he wishes to

take the stand or not, without the Judge's ruling upon defendant's prior record, as to whether it would be explored upon his testimony or placed into issue by a certified transcript from the Secretary of State's Office."

The court responded:

"My general—my initial reaction would be I agree with you. I don't believe the State should go into the defendant's prior record. Unless something comes out in the defendant's testimony, then that would open the door. But as a general rule, I prohibit the State from going into that."

Immediately after this exchange, the attorneys argued over whether the glass taken from defendant's car should be admitted into evidence, and the court ruled that it was admissible. Then, defense counsel made a motion for a directed verdict, which was denied. The defendant then called Sergeant Dillenkoffer to testify, who stated that at the police station, defendant informed him that he felt ill because his blood sugar was low. Defendant requested sugar, which the sergeant provided, and which defendant consumed. The defense rested after this testimony.

The State recalled Sergeant Dillenkoffer in rebuttal, who testified that the breathalyzer machine which would have been used on defendant could distinguish acetone from ethyl alcohol, the type of alcohol used to make alcoholic beverages.

In its closing arguments, the State emphasized four factors to establish that defendant was intoxicated: (1) defendant's driving was erratic; (2) the sergeant's observations as to defendant's appearance; (3) defendant's admission that he had a drink; and (4) that he failed all six points of the HGN test. The State characterized Dr. Milton's testimony as not proving anything about defendant's condition on the date of his arrest, as the testimony dealt in generalities about diabetes, and argued that the doctor could not accurately describe defendant's physical condition at the time of his arrest.

In his closing argument, defense counsel attacked the accuracy of the HGN test and the sergeant's ability to analyze it and argued that defendant was suffering from hypoglycemia when he was arrested and his condition was not caused by the consumption of alcohol.

The jury returned verdicts of guilty as to the offenses of driving while under the influence of alcohol and driving on the wrong side of a roadway, but found defendant not guilty of the offense of illegal transportation of alcohol in a motor vehicle, and he appeals.

On appeal, defendant contends that the conviction of driving while under the influence of alcohol should be reversed because his trial

counsel was so inadequate and incompetent as to deprive him of his right to counsel. He argues that defense counsel should have objected to the admission of the HGN test results and should not have advised defendant to not testify in trial.

■ The applicable test in analyzing a claim of ineffective assistance of trial counsel is set forth in *Strickland v. Washington* (1984), 466 U.S. 688, 80 L. Ed. 2d 674, 104 S. Ct. 2052, which our supreme court adopted in *People v. Albanese* (1984), 104 Ill. 2d 504, 526, 473 N.E.2d 1246, 1255. (Accord *People v. Rogers* (1988), 172 Ill. App. 3d 471, 475, 526 N.E.2d 655, 659.) The *Strickland* test is a two-pronged examination that requires a defendant to show that (1) counsel's conduct was professionally deficient; and (2) but for the deficiency, there is a reasonable probability that the fact finder would have had a reasonable doubt respecting defendant's guilt. (*Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.) Competency of counsel is presumed (*People v. Stewart* (1984), 101 Ill. 2d 470, 492, 463 N.E.2d 677, 688), and counsel's performance must be evaluated from his perspective at the time of trial (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2066).

■ We consider first defendant's argument that he was denied the effective assistance of trial counsel because counsel failed to object to the introduction of the HGN test results. Alleged incompetence arising from a matter of trial tactics or strategy will not support a claim of ineffective assistance of counsel. (*People v. Shum* (1987), 117 Ill. 2d 317, 370, 512 N.E.2d 1183, 1205.) Defendant argues that the failure to object to the introduction of the HGN test results was not a trial tactic, but an error due to misapprehension of the law, asserting that under *People v. Vega* (1986), 145 Ill. App. 3d 996, 496 N.E.2d 501, a case which had been decided prior to defendant's trial, the evidence of the HGN test results was not admissible. The State responds that there is no certainty that the evidence would not have been admitted because in *People v. Dakuras* (1988), 172 Ill. App. 3d 865, 527 N.E.2d 163, decided after defendant's trial, this court did not definitively rule that HGN test results are always inadmissible.

The testimony in the present case relating to the HGN test is similar to that in *People v. Vega*, where the court determined that the test results were erroneously admitted in evidence as the State failed to lay a proper foundation through expert testimony to determine the validity of the test. The court considered that the testimony of the arresting officer who administered the test, as in the present case, provided an inadequate foundation. (*Vega*, 145 Ill. App. 3d at 1000-01; compare *People v. Seymoure* (1987), 158 Ill. App. 3d 1038, 511 N.E.2d

986.) In *People v. Dakuras*, this court determined that the results of an HGN test to show a defendant's blood-alcohol concentration is inadmissible in a prosecution under section 11—501(a)(2) of the Illinois Vehicle Code (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501(a)(2)) as it is not a chemical test required by the Code. This court did not consider the reliability and admissibility standards for scientific testing. *Dakuras*, 172 Ill. App. 3d at 868, 870.

We agree, as determined by the reviewing court in *People v. Vega*, that a sufficient foundation for admission of the HGN test was not offered by the State in this case and the testimony and conclusions of Sergeant Dillenkoffer relating to that test would have been properly stricken, if defendant had sought to do so. We do not agree, however, that defendant was denied effective assistance of counsel by the strategy employed by his attorney in defending the case. As in *People v. Vega*, we also find that there was sufficient other competent evidence to sustain the verdict of the jury.

The defense offered in trial was premised upon the fact defendant suffered from a diabetic condition which produced symptoms similar to those shown by an intoxicated person. Defendant's physician testified as an expert witness to these facts and sought to relate the diabetic symptoms to those seen in defendant by the arresting officer and in explanation of some of the indicia of supposed intoxication which resulted in defendant's arrest. Defendant's counsel drew the admission from the officer that he had no knowledge of other medical conditions which might cause the nystagmus condition of defendant's eyes attributed by the officer to alcohol. It seems apparent that defendant's trial counsel wanted the arresting officer's testimony relating to this test before the jury, knowing that defendant's physician would testify that diabetes could damage vision and result in blindness because of injury to the retina. The test defendant now asserts evidences incompetent counsel depends for its conclusions as to intoxication upon the amount of erratic movement in the subject's eyes. Counsel clearly sought to relate the test, and the other indicia of intoxication observed by the arresting officer, to defendant's medical condition. That defense was feasible, but obviously not convincing to the jury.

■ Defendant also argues that his trial counsel erroneously advised him not to testify because of a groundless fear on the part of his attorney that the State would then impeach defendant with his prior record. In support of this argument defendant refers at length in his brief to the alleged facts stated in an affidavit defendant filed, by his new attorney, in support of his post-trial motion. The affidavit also

purports to state at length and in detail the trial testimony he would have given had defendant been advised by his trial counsel to testify on his own behalf. Defendant argues that his trial counsel's tactical decision that he should not testify was so unsound as to make clear counsel's incompetency and ignorance of the law relating to admission of defendant's past driving record. Defendant concludes that his decision not to testify on his own behalf was thus not made knowingly and voluntarily and his conviction should be reversed, citing *People v. Wright* (1986), 111 Ill. 2d 18, 488 N.E.2d 973.

The trial judge rejected these arguments when presented by defendant's new counsel in support of his post-trial motion and was also not persuaded by present counsel's further assertion that defendant was punished by his trial attorney not only by the way he handled the case, but by requiring a fee in excess of $10,000.

It is apparent that trial counsel was concerned that if defendant should testify he might be impeached by his prior record. Counsel may well have also concluded that defendant could add little to the evidence already before the jury through the officer's testimony and that of defendant's physician. Certainly the jury was well aware of defendant's diabetic condition and the medical symptoms which it could produce. That was what the defense relied upon for acquittal, and it was presented to the jury with evidentiary support. Had defendant chosen to testify and been impeached by his past driving record after inadvertently opening the door, the result would have been even more certain.

Whether certain witnesses will be called to testify or objections to the admission of evidence will be made in trial are strategic and tactical decisions which are seldom reviewed (*People v. Starks* (1983), 122 Ill. App. 3d 228, 233-34, 460 N.E.2d 1181), and we will not do so further here.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

INGLIS and WOODWARD, JJ., concur.