THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDRE D. ROBINSON, Defendant-Appellant.

First District (3rd Division)    No. 1—02—2841

Opinion filed June 16, 2004.

Andrea Montavon-McKillip, of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, John E. Nowak, and Susan Meczyk, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SOUTH delivered the opinion of the court:

This appeal arises from defendant's conviction following a jury trial for driving with a blood-alcohol concentration (BAC) of .08 or more and driving while under the influence of alcohol. He was placed on a period of 18 months' court supervision with the condition that he undergo three drug tests during that period and pay a fine of $325.

At trial, Officer Richard Barber of the Chicago police department testified that on July 22, 1999, he was on routine patrol when he observed defendant's car in front of him. At that time, the car crossed over the divided white line several times, and the brakes kept going on

for no apparent reason. Based upon these observations, Officer Barber effectuated a traffic stop. As he was speaking to the driver, defendant, he observed that his eyes were bloodshot, his speech was slurred, and he stuttered. He also detected a strong odor of an alcoholic beverage on his breath. Officer Barber then ordered defendant to get out of the car and noticed that defendant's balance was unsure, and he was swaying from side to side.

Defendant agreed to take two field sobriety tests at the request of Officer Barber. The first test was the one-leg stand. He was instructed to stand on one foot and lift the other foot 6 inches off the ground for 30 seconds. Officer Barber testified that defendant failed this test because he was unable to keep his leg raised for 30 seconds, and he put his foot down twice within 20 seconds. Defendant was then administered the horizontal gaze nystagmus test (HGN). Officer Barber testified that as a police officer he had been trained and certified to administer the HGN test and had performed it hundreds of times over the past 10 years. He described nystagmus to the jury as an involuntary jerking of the eyeball while it is moving slowly from one side to the other. The subject is instructed to stare at an object or stimulus and follow it with his eyes without turning his head. In this case, Officer Barber chose a pen as a stimulus and held it 12 to 15 inches from the tip of defendant's nose. Defendant was instructed to stare at the tip of this pen while Officer Barber moved it from left to right. It was explained to the jury that if the eye jerks within a 45-degree angle, that is a sign the person is impaired. In this case, defendant's eyes jerked within a 45-degree angle, causing Officer Barber to conclude that he was under the influence of alcohol. Defendant was also asked to perform two other field sobriety tests, *i.e.*, the walk-and-turn and finger-to-nose tests, but he declined. At that time, he was placed under arrest and transported to the police station. At the police station, after defendant was read his *Miranda* rights, he admitted that he had consumed six beers prior to driving that evening. He also agreed to take a Breathalyzer test, the results of which showed that his blood-alcohol concentration was .10.

On appeal defendant has raised four issues: (1) whether the trial court erred in excluding evidence of the Breathalyzer machine's malfunctions; (2) whether the trial court erred in admitting the HGN test absent a *Frye* hearing; (3) whether the trial court erred when it prevented defendant from cross-examining the police officer about his overtime compensation for appearing and testifying in court; and (4) whether the trial court erred in imposing fines without making a prior determination as to defendant's ability to pay.

Prior to trial, defendant filed a motion *in limine* to exclude the

results of the Breathalyzer test. In that motion, he argued that the State would be unable to lay a proper foundation for the admission of the Breathalyzer because (1) the inspector had failed to perform a second analysis on a certified controlled reference sample the month following defendant's test at an interval not exceeding 45 days from the first certification, and (2) the State would be unable to demonstrate that the reason for the machine's removal from service two weeks after defendant's test was unrelated to and did not concern the accuracy of his test. In support of this motion, defendant sought to call Larry Etzkorn, the technical administrator for the Alcohol and Substance Testing Program of the Illinois State Police. The State objected to his testifying, so the trial court conducted a *voir dire* outside the presence of the jury.

During that *voir dire*, Etzkorn testified that in 1999 he was the district chief for the Alcohol and Substance Testing Program with the Illinois Department of Public Health. As the district chief, he was responsible for overseeing the monthly accuracy certification of Breathalyzer test machines used in the State of Illinois. He was also a certified Breathalyzer operator and a Breathalyzer instructor. One of his duties as the district chief for the Alcohol and Substance Testing Program was to maintain the records that came off of the certifications and to monitor the information. In conjunction with those duties, logbooks were maintained at the site with the instrument with respect to the chemical tests that were performed on them. One of the things reflected in these logbooks was the certification process.

In May of 1999, Etzkorn received a malfunction report regarding the Intoximeter 3000, serial number 4038, which is the machine defendant was to be tested on two months later. A malfunction report is a report that is sent in by an inspector whenever an instrument is malfunctioning. On May 20, 1999, it was reported that there was a malfunction of the "T-Cell" on machine number 4038. The T-Cell is a secondary sensory device which is part of the machine's analytical components that picks up on any interference which may cause a machine to produce a false positive. That interference could be, for example, acetone from a diabetic or anything else in the air. According to Etzkorn, problems with T-Cells are rather common and can occur every two to five years. If there is a problem with the T-Cell, that information is conveyed by the instrument itself. In other words, the instrument reports the particular type of malfunction and will not permit itself to operate until the problem is repaired. The particular message that was displayed in this instance was that the T-Cell was "out of range." Etzkorn testified that when that occurs, the machine will not permit a sample to be taken.

According to the logbook for this particular Breathalyzer, the T-Cell was replaced, and the machine was recertified and placed back into service. On July 7, 1999, the entry in the logbook for machine number 4038 states that the T-Cell was no longer a problem, and it was certified as accurate, which means it was acting appropriately and providing results within the allowable range for that instrument. According to Etzkorn, if the T-Cell were still malfunctioning, the machine never would have completed the certification process.

On August 5, 1999, two weeks after defendant's test, Etzkorn testified that he received another malfunction of machine number 4038. This time the report stated that the "flow thermistor" was not operating properly and, therefore, was unable to obtain a sample. He described the flow thermistor as a sensor valve that regulates the temperature. This valve remains open while the subject is blowing into the machine. Once the subject stops blowing, the flow thermistor closes, and a sample is taken. Etzkorn described the flow thermistor as a very important component of the instrument because it gives a proper deep-lung sample. On August 5, 1999, the flow thermistor was closing too soon, thereby preventing it from taking a full sample. The August 5, 1999, report stated that the cause of this problem was unknown other than normal "wear and tear."

According to Etzkorn, the flow thermistor was replaced, but the machine continued to give unstable and erratic readings. Ultimately, the determination was made that the machine was not functioning properly enough to be placed back into service, so it was not certified and eventually destroyed.

Etzkorn testified that in his expert opinion the machine on which defendant was tested on July 22, 1999, was working properly. In support of that opinion, he emphasized that if there had been a problem with the flow thermistor on July 22, 1999, the machine would not have produced a reading. He described all Breathalyzer machines as being self-diagnostic, and that if they detect a malfunction, they will not proceed any further or provide a chemical test result. Etzkorn also stated that the ticket from machine number 4038 indicates that it did, in fact, run a self-diagnostic check for internal problems on July 22, 1999, and that the test indicated that the instrument was working properly at that time. He did not confine his testimony to the T-Cell or the flow thermistor. He stated unequivocally that if there had been anything wrong with the instrument, it would have reported the problem and refused to take a sample.

At the conclusion of the *voir dire,* the trial court held that Etzkorn would not be allowed to testify because his testimony was irrelevant since the only issue before the jury was whether the Breathalyzer was

functioning properly on July 22, 1999, when the test was administered to defendant. The court made repeated references to Etzkorn's testimony that if the machine had been malfunctioning on that date and time of defendant's test, it would not have produced a reading or sample. The court concluded that the problem with the machine on August 5, 1999, did not in any way affect or concern it on July 22, 1999, and that Etzkorn's testimony would serve only to "confuse the issues" and "mislead the jury."

On appeal, defendant argues the trial court denied him the right to present his defense at trial by not allowing him to introduce Etzkorn's testimony that the machine malfunctioned two months before his test and two weeks after his test. Defendant maintains that the evidence of both malfunctions would have rebutted the State's case by demonstrating that the machine was error-prone, and that the results of his breath test were unreliable, thereby raising a reasonable doubt as to his guilt.

The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and its ruling may not be reversed absent a clear abuse of discretion. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Section 11—501.2 of the Illinois Vehicle Code (625 ILCS 5/11—501.2 (West 2000)) deals directly with the admissibility of Breathalyzer test results. That statute reads in pertinent part:

> "Upon the trial of any civil or criminal action or proceeding arising out of an arrest for an offense as defined in Section 11—501 *** evidence of the concentration of alcohol *** in a person's *** breath at the time alleged, as determined by analysis of the person's *** breath *** shall be admissible. Where such test is made the following provisions shall apply:
>
> 1. Chemical analyses of the person's *** breath *** to be considered valid under the provisions of this Section shall have been performed according to standards promulgated by the Department of State Police by a[n] *** individual possessing a valid permit issued by that Department for this purpose. The Director of State Police is authorized to approve satisfactory techniques or methods, to ascertain the qualifications and competence of individuals to conduct such analyses, to issue permits *** and to certify the accuracy of breath testing equipment. The Department of State Police shall prescribe regulations as necessary to implement this Section." 625 ILCS 5/11—501.2 (West 2000).

Chemical test results are admissible only if the State can show that the instruments used to conduct these tests complied with all of the proper statutory and regulatory standards outlined in section 11—501.2 of the Illinois Vehicle Code. *People v. Orth*, 124 Ill. 2d 326, 340,

530 N.E.2d 210, 216-17 (1988). Illinois law provides that evidence of concentration of alcohol on a person's breath will not be admissible at trial unless the chemical analysis is performed according to standards promulgated by the Department of Public Health, which provide for a continuous observation of the subject for at least 20 minutes prior to collection of the breath specimen, during which period the subject must not have ingested alcohol, food, or drink, or regurgitated, vomited or smoked. *People v. Haney*, 155 Ill. App. 3d 44 (1987).

Defendant relies heavily upon the Fourth District case of *People v. Boughton*, 268 Ill. App. 3d 170 (1994). The issue in that case was whether a proper foundation had been laid for the admission of the Breathalyzer test results. The logbook indicated that the machine had been inspected and certified by an inspector of the Illinois Department of Public Health on November 28, 1993, and December 21, 1993. However, the logbook also indicated that on December 13, 1993, the inspector took the machine out of service for repairs. The defendant in that case argued that since the inspector did not testify at trial as to the reason for or the nature of the repairs, the State had failed to establish a proper foundation for the admission into evidence of the Breathalyzer test results. *Boughton*, 268 Ill. App. 3d at 172. The appellate court agreed with defendant and held that the State had the burden of showing that the Breathalyzer had been tested and certified within 45 days of defendant's test, and that it was also required to prove that the repair of December 13, 1993, did not concern the accuracy of the test on November 28, 1993. The conviction was reversed, and the cause was remanded for a new trial. *Boughton*, 268 Ill. App. 3d at 173.

■ In the instant action, Officer Barber testified that he had been a certified breath technician for 10 years and had conducted hundreds of such tests. He also testified that immediately prior to defendant's test, the machine ran a self-diagnostic test, calibrated itself and displayed the word "blow," meaning that it was ready to take a sample. He further testified that he observed defendant for 20 minutes prior to the test, during which time he did not smoke, regurgitate or drink, and that the results appearing on the printout sheet were from the test which was given to defendant. Officer Barber's testimony was consistent with that of Etzkorn that if the machine had not been functioning properly at the time of defendant's test, the word "blow" would not have appeared on its screen and a sample would not have been taken.

Unlike here, in *Boughton* there was no evidence as to why the machine malfunctioned or the nature of the repairs. In the instant case, there was ample evidence that machine number 4038 had been

tested and certified on July 7, 1999, well within 45 days of its use in testing defendant, and that the prior and subsequent malfunctions did not in any way affect or concern the machine on July 22, 1999. Defendant acknowledges Etzkorn's testimony that the machine was working properly when he was administered the test on July 22, 1999, but maintains that evidence of the machine's malfunctions which ultimately led to its being removed from service and destroyed should have been presented to the jury in order for it to determine the reliability of the Breathalyzer results. Defendant argues that Etzkorn's testimony only related to the problems with the T-Cell and the flow thermistor, and that there could have been other problems with the machine that would not have been reported during the self-diagnostic check.

Contrary to defendant's construction of the evidence, Etzkorn's testimony was very clear that the purpose of the self-diagnostic check which the Breathalyzer conducts prior to each test is to determine if there are any internal problems. If there are internal problems, the machine displays the particular problem that it detects and, most importantly, does not take a sample. The T-Cell and flow thermistor problems happened to be the two problems that this particular Breathalyzer experienced during the times in question. There is no evidence in this record that the malfunction on August 5, 1999, in any way affected or concerned machine number 4038 as it functioned on July 22, 1999. We are hard-pressed to understand what the "defense" was going to be when all of the evidence demonstrated that the machine was properly tested and certified within 45 days of defendant's test, was in proper working condition, and that any prior or subsequent malfunctions in no way affected or concerned the accuracy of defendant's test results. However much he would have tried, defendant was not going to get Etzkorn or anyone else to testify that the prior and subsequent malfunctions of machine number 4038 rendered his test unreliable. Therefore, we must agree with the trial court that Etzkorn's testimony would have only served to confuse the issues and mislead the jury. Certainly, at the very least, it would have been irrelevant.

For the foregoing reasons, we hold that the trial court did not abuse its discretion in denying defendant's motion *in limine* to exclude from evidence the results of the Breathalyzer test.

■ The next issue is whether the trial court erred when it failed to conduct a *Frye* hearing regarding the reliability of the HGN test.

Prior to trial, defendant filed a motion *in limine* to exclude the results of the HGN test that was administered to defendant by Officer Barber on July 22, 1999. The motion argued that HGN tests have not

been generally accepted in the scientific field and that, absent a foundation laid by the prosecution that the HGN test comported with the requirements of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), the results should be barred.

General acceptance was established as the test in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), a case involving the admissibility of polygraph tests:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while the courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

There are a few cases in this state that have addressed the question regarding the admissibility of HGN tests in prosecutions for driving under the influence (DUI). In *People v. Buening*, 229 Ill. App. 3d 538 (1992), the Fifth District, after undertaking a comprehensive discussion of Illinois case law and that of other jurisdictions which have addressed this issue, ruled that HGN tests may be admitted as evidence of intoxication, as is any other evidence of a defendant's behavior in a DUI prosecution, as long as a proper foundation has been laid, *i.e.*, the officer's education and experience in administering the test and a demonstration that the procedure was properly administered. *Buening*, 229 Ill. App. 3d at 546. Similarly, in *People v. Wiebler*, 266 Ill. App. 3d 336 (1994), the Third District stated that it found the reasoning of the *Buening* court to be persuasive and held that the HGN test results are admissible although they are not conclusive evidence of intoxication, and that that evidence is only to be considered as a factor, along with other evidence of a defendant's behavior, in determining whether he is under the influence of alcohol. *Wiebler*, 266 Ill. App. 3d at 339. *Wiebler* concluded that the HGN test results were properly admitted at trial in that case because the police officer testified regarding his education and experience in administering the test, and he testified as to how the test was administered.

In contrast, a divided panel of the Fourth District held that the results of the HGN test were inadmissible absent a *Frye* hearing. In *People v. Kirk*, 289 Ill. App. 3d 326 (1997), the appellate court criticized *Buening* because it relied upon the opinions of other courts when it decided that the results of an HGN test were admissible absent a *Frye* hearing. *Kirk* took the position that the issue of whether HGN tests have obtained general acceptance in the scientific community has not

been fully and thoroughly litigated, noting that there is some opposition to the test both within the scientific community and among the courts. *Kirk*, 289 Ill. App. 3d at 334. *Kirk* also noted that there are several scientific articles which insist that the HGN test has not gained general acceptance within the scientific community. *Kirk*, 289 Ill. App. 3d at 334. However, while *Kirk* concluded that it was error to admit the HGN test evidence during defendant's DUI trial without a *Frye* hearing, it held that such error was harmless in light of the other evidence of intoxication. *Kirk*, 289 Ill. App. 3d at 334.

Finally, in *People v. Basler*, 193 Ill. 2d 545 (2000), a plurality of our supreme court refused to consider whether HGN test results should be admitted in prosecutions for driving under the influence because the validity of that test had not been challenged at the trial level and was, therefore, waived. However, later in the opinion the court stated that HGN tests are no longer considered novel for purposes of a *Frye* hearing and that the State should not be put to the burden of having to reestablish the test's validity in every case. *Basler*, 193 Ill. 2d at 551. Specifically, the court stated:

> "Where, as here, a scientific method has been shown to be generally accepted, a *Frye* test is no longer necessary each time the State seeks to use evidence obtained by that method." *Basler*, 193 Ill. 2d at 551.

The dissent in *Basler* criticized the plurality for its approach to the question. It pointed out that on the one hand the plurality had declined to consider whether HGN tests results should be admitted in DUI prosecutions, but then on the other hand it expressly endorsed the holdings of *Buening* and *Wiebler* and found that a *Frye* test is no longer necessary with the HGN test because it has been generally accepted within the scientific community. *Basler*, 193 Ill. 2d at 556-57 (McMorrow, J., dissenting, joined by Freeman, J.). Additionally, the special concurrence stated that the plurality's discussion concerning the admissibility of HGN test results was entirely *dictum* without precedential value. *Basler*, 193 Ill. 2d at 552 (Heiple, J., specially concurring, joined by Bilandic, J.).

We are compelled to agree with the holdings in *Buening* and *Wiebler* and the *dictum* in *Basler* and find that HGN is generally accepted in the scientific community, no longer necessitating a *Frye* hearing. The HGN test has been around for over 25 years and has been used in thousands of DUI arrests throughout the country and can hardly be considered "novel." In 1977, the National Highway Traffic Safety Administration commissioned the Southern California Research Institute to determine the best method for detecting drunk drivers through the use of field sobriety tests, and that study revealed

that the HGN test, when used with the walk-and-turn and one-leg stand tests, is the most accurate and effective method of detecting impairment. *National Highway Traffic Safety Administration, U.S. Department of Transportation, Psychophysical Tests for DWI Arrests*, No. DOT—HS—802—424 at 39 (June 1977). In fact, a subsequent study revealed that of the three field sobriety tests, the HGN test was the most powerful. *National Highway Traffic Safety Administration, U.S. Department of Transportation, Field Evaluation of a Behavioral Test Battery for DWI*, No. DOT—HS—806—475 at 4 (September 1983). We know of no case where a defendant has ever been convicted or even arrested solely on the basis of an HGN test. We agree with *Wiebler* that the results of an HGN test are not conclusive and can only be considered along with other evidence of intoxication. Once a proper foundation has been laid as to the proper administration of the HGN test by a properly trained police officer, the results of that test may be admitted, along with other evidence of intoxication, absent a *Frye* hearing.

In the instant case, the proper foundation was laid when Officer Barber testified that he was trained and certified in the use of HGN field sobriety tests and had conducted hundreds of them for 10 years. He was thoroughly cross-examined by defense counsel regarding other conditions which may cause nystagmus, but he testified that he was trained to distinguish those conditions. Furthermore, there was other evidence of defendant's impairment, *i.e.*, his erratic driving, his bloodshot eyes, his unsure balance, his swaying from side to side, the strong odor of an alcoholic beverage on his breath, his failure of the one-leg stand test, and his failure of the Breathalyzer test. For these reasons, we find that the trial court properly denied the motion *in limine* to bar the results of the HGN test absent a *Frye* hearing.

The next issue is whether the trial court erred when it limited defense counsel's cross-examination of Officer Barber's overtime compensation for appearing in court.

A defendant has the right to cross-examine a witness for the purpose of showing the witness's interest, bias or motive to testify falsely. *People v. Britt*, 265 Ill. App. 3d 129, 638 N.E.2d 282 (1994). Such cross-examination may concern any matter that goes to explain, modify, discredit or destroy the witness's testimony on direct examination. See *People v. Aughinbaugh*, 36 Ill. 2d 320, 223 N.E.2d 117 (1967). The trial court should give the defendant the widest latitude to allow him to establish a witness's bias or motive. *People v. Gonzalez*, 104 Ill. 2d 332, 472 N.E.2d 417 (1984). However, it is well settled that the scope of cross-examination is largely within the trial court's discretion and that its rulings will not be overturned unless an abuse of that

discretion results in manifest prejudice to the defendant. *People v. Hudson*, 157 Ill. 2d 401 (1993).

We do not have a situation where an expert witness was retained by the State or a private citizen was paid to testify against defendant. Obviously, if that were the case, the witness's compensation would be highly probative of his bias and motive to testify falsely. However, Officer Barber is a city employee who was testifying as the State's chief witness in connection with his regular duties as a Chicago police officer. As part of those duties, he is required to testify at trial in connection with any of his DUI arrests that proceed to trial. His overtime compensation is no more relevant or probative of his bias or motive to testify falsely than that of a medical examiner who testifies in a murder case or a forensic chemist who testifies in a drug case, both of whom are State employees who also receive overtime compensation for their appearances in court. For these reasons, we find the trial court did not abuse its discretion in sustaining the State's objection to the cross-examination of Officer Barber's overtime compensation.

■ Lastly, defendant argues that the trial court erred in imposing a fine of $325 without first determining his ability to pay. The State agrees, however, that this case should be remanded for a hearing to determine defendant's financial resources and the proper amount of a fine, if any, to be imposed. Therefore, we remand this matter for the limited purpose of the trial court's determination of the appropriate amount of a fine, if any, to be assessed against defendant.

Accordingly, the judgment of the circuit court is affirmed. The $325 fine is vacated, and the matter is remanded to the circuit court for a hearing to determine the appropriate amount of a fine.

Affirmed; vacated and remanded with directions.

HOFFMAN, P.J., and HALL, J., concur.